## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

DIANE M. LENTINI,                    :

       Plaintiff            :    **CIVIL ACTION NO. 4:14-0961**

    v.                          :        **JUDGE MANNION**

GEISINGER MEDICAL CENTER,            :
SHAMOKIN AREA COMMUNITY
HOSPITAL, and GEISINGER              :
HEALTH SYSTEM FOUNDATION,
                      :

       Defendants           :

                      :

## <u>MEMORANDUM</u>

Pending before the court is the defendant's motion for summary judgment. (Doc. 36). Based upon the court's review of the motion and related materials, the defendant's motion will be granted.

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." <u>Fed. R. Civ. P. 56(c)</u>; <u>see also</u> <u>Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)</u>; <u>Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990)</u>. A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. <u>Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)</u>; <u>Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp.</u>

836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an

element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

The plaintiff has brought the instant action alleging age discrimination and retaliation under the Age Discrimination in Employment Act, ("ADEA"), as well as under the Pennsylvania Human Relations Act, ("PHRA")[1]. The undisputed facts, as supported by the record[2], establish that the plaintiff graduated from the Pottsville School of Nursing in 1966 and has been a registered nurse for 50 years. The plaintiff worked at the Pre-Surgery Clinic at the Shamokin Area Community Hospital, ("SACH"), as a staff nurse until SACH merged with Geisinger, ("G-SACH").

On January 1, 2012, the plaintiff, at age 66, was retained by G-SACH as an at-will Pre-Surgery Center Registered Nurse, ("PSC RN"), at its Shamokin Campus. In this capacity, the plaintiff's patients included both high

___

[1]ADEA and PHRA claims are analyzed under the same standard. See, e.g., Colwell v. Rite Aid Corp., 602 F.3d 495, 500 n.3 (3d Cir. 2010).

[2]The court notes that numerous denials by the plaintiff of factual statements made by the defendant are either without record support or are in direct contradiction to the record and deposition testimony provided by the plaintiff herself. Such denials do not serve the interests of the plaintiff and only make the court's task in determining whether there are material issues of fact in dispute more difficult.

risk and pediatric patients. The plaintiff's job duties included performing assessment of patients' surgical and anesthesia risks in preparation for elective surgery, recording information in the patients' electronic health record, maintaining the highest level of patient confidentiality at all times, and demonstrating electronic patient information charting, ("EPIC"), computer skills. According to the Associate Vice President of Surgery and Anesthesia for the Geisinger Clinic, Kyle Snyder, appropriate charting by PSC RNs is critical. Patrick Konitzer, M.D., the anesthesiologist at the Pre-Surgery Clinic at G-SACH, testified that, if deviations or other information are not charted appropriately, it can put patients at risk and subject Geisinger to potential liability. The plaintiff herself has admitted that clarity in documentation is key to the anesthesia process and quality care can be compromised without it.

Prior to her retention, in September 2011, the plaintiff participated in a five-day orientation session at Geisinger's Danville PSC, which included training on Geisinger's code of conduct policies, handbook policies, and other matters. The plaintiff also shadowed the Danville PSC RNs, received EPIC training, and engaged in one-on-one meetings with Geisinger's PSC Clinic Nurse Supervisor, Lori Naugle. The plaintiff's one-on-one meetings included reviewing Geisinger's human resources related and clinical policies and procedures, and discussing the plaintiff's duties as a PSC RN. After her hire, the plaintiff received a formal orientation that included job-specific topics like

4

patient safety, HIPAA violations, and Geisinger's InfoWeb, an internal computing system containing Geisinger's policies.

During her employment with G-SACH, the plaintiff was supervised by Ms. Naugle, who had the power to suspend and/or terminate her.[3] Although she did not recall specifics, Ms. Naugle testified that, during the first six months of the plaintiff's employment, there were occasions when she sat with the plaintiff and they reviewed patient charting together. At that time, Ms. Naugle testified that she believed that the plaintiff was qualified to perform her job. The plaintiff testified that, during this same time, she had no issues with Ms. Naugle. In fact, in June 2012, Ms. Naugle issued the plaintiff a 2.97 out of 4.0 overall score at her six-month performance evaluation, which was accompanied by a raise. The plaintiff scored better than her colleagues, who were younger than she was at the time. The plaintiff was 67 years old when she received this review.

In July 2012, Ms. Naugle testified that she attended a managers meeting where G-SACH's surgical volumes were presented. As a result of this meeting, Ms. Naugle realized that the plaintiff's patient volume reports were reflecting a higher patient volume than what G-SACH was actually

---

[3]Although the Pre-Surgery Clinic falls under the anesthesiologists and works and directly interacts with the anesthesia line for surgery patients, the record is clear that Ms. Naugle was the plaintiff's supervisor, not Dr. Konitzer, who, as mentioned, was the anesthesiologist at the Pre-Surgery Center.

experiencing. Ms. Naugle testified that, as a result of the meeting, she asked her supervisor, Kyle Snyder, to confirm that the actual patient volume reported at the meeting was accurate. The numbers were confirmed, after which Ms. Naugle discussed the patient volume documentation issue with the plaintiff. No discipline was imposed at that time; however, the plaintiff was coached by Ms. Naugle about correctly documenting patient volume.

In August 2012, the plaintiff was offered additional help by way of training with shortcuts on the computers. The plaintiff accepted the offer and Kathy Hill, a Danville PSC RN traveled to G-SACH for the training sessions from August 28, 2012, through August 31, 2012. During this time, the plaintiff received one-on-one training from Ms. Hill in areas such as EPIC shortcuts, phone pool protocol, the importance of documentation, Geisinger's anesthesia policies and where to find them on Geisinger's InfoWeb. The plaintiff admitted that she found value in the training and received detailed documentation summarizing the training.

In September 2012, Ms. Naugle testified that she followed-up on the plaintiff's training by reviewing the plaintiff's charts from September 7, 2012 and September 10, 2012. Afterward, the plaintiff testified Ms. Naugle had a conversation with her in which she was informed that she was not doing her job to Ms. Naugle's expectations. When questioned on specific instances, the plaintiff admitted in her testimony that she had not followed policy in

documenting medication instructions and had improperly copied forward information in a chart which should have been deleted. As a result of her performance issues, the plaintiff received a verbal warning under Geisinger's Performance Improvement Plan, ("PIP").[4] The plan included, among other things, "[i]mmediate and sustained improvement in the above areas to encompass the following . . . 5. accuracy in documented data - This may mean double checking numbers for accuracy this needs to be 100%." After the PIP meeting, the plaintiff specifically asked Ms. Naugle to review her charts and email any problems found to the plaintiff's attention. The plaintiff has admitted that, if someone is on a PIP, he or she would be subjected to additional scrutiny. However, no other PSC nurse was placed on a PIP during this time period.

Ms. Naugle testified that, if she found a repeated issue, she would talk to the nurse about it, and then follow up with charts they have done. If the nurse would continue to have the same charting errors, it would be a performance issue at that point. In her PIPs, Ms. Naugle did not reference any specific infractions that were repeated by the plaintiff testifying that the PIPs are only to contain a summation of errors, not every error identified.

---

[4]The plaintiff acknowledges being verbally warned, but denies having received the first page of the written summary of the verbal warning. Despite this, the record demonstrates that the plaintiff signed the final page of the verbal warning on September 17, 2012, acknowledging its receipt. (Doc. 39-1, Ex. 13).

Erin Winn, Senior Human Resources Generalist, testified that Ms. Naugle reached out to her about work performance concerns regarding the plaintiff involving lack of documentation and not following protocols of the department. Ms. Winn provides human resource guidance to managers working through employee issues, as well as serving as a resource for employees. She maintains an office at G-SACH. Ms. Naugle was consistent in her concerns to Ms. Winn that the plaintiff demonstrated work performance issues in that patient-related work was not completed appropriately and documentation was not clear or complete.

The plaintiff testified that her first interaction with Ms. Winn was prior to her written PIP when Ms. Winn called the plaintiff into her office to introduce herself and to express the concerns that Ms. Naugle was having with respect to the plaintiff. At that time, the plaintiff testified that, while Ms. Winn did not expressly do so, she felt Ms. Winn was suggesting that she resign or retire. Ms. Winn denies ever making such a suggestion, expressly or otherwise. Subsequently, in October 2012, Ms. Winn participated in the plaintiff's written warning meeting with Ms. Naugle and the plaintiff. According to the plaintiff's written warning PIP, the plaintiff was counseled, in part, that "attention to accurate documentation is a key part of [her] position. Clarity in documentation is key as the anesthesia process is a working document and if communication is not excellent then quality care is compromised." The

plaintiff's action plan required immediate and sustained improvement in five areas, including accuracy in charting. The plaintiff testified that Ms. Winn asked her at the meeting if there was anything she or Ms. Naugle could do to help the plaintiff. In response, the plaintiff requested a bigger office and a privacy curtain for the patient when she was doing EKGs, but she did not ask for any additional EPIC or goals training. The plaintiff testified that she chose to move forward in meeting the expectations of the position, instead of undergoing some other type of training. At that point, the plaintiff knew that Ms. Naugle would be reviewing her charts, as she had already been doing so, and expressed to Ms. Winn and Ms. Naugle that she felt that she was being subjected to higher scrutiny than others.

On a number of occasions between November 26, 2012 and November 29, 2012, the record reflects that the plaintiff was directed by Ms. Naugle to either correct or update medical information in her files. On November 29, 2012, Ms. Naugle emailed a copy of a suspension-level PIP to her supervisor, Mr. Snyder, and Ms. Winn. According to Ms. Naugle's verification and exhibits, she attempted to call the plaintiff on November 29, 2012, and email her on December 3, 2012 to schedule a meeting.[5] Also on December 3, 2012,

---

[5]The plaintiff denies this. However, the defendant has provided documentation to demonstrate that Ms. Naugle did, in fact, attempt to email the plaintiff and send her a staff message on December 3, 2012 to schedule a meeting with her that day.

the record demonstrates that Ms. Naugle informed the plaintiff of a number of issues occurring in her records. The plaintiff eventually advised Ms. Naugle that she was unable to meet with her until December 5, 2012.

In the meantime, on December 4, 2012, the plaintiff emailed Ms. Winn and alleged, for the first time, age discrimination and harassment by Ms. Naugle claiming that her records were being unfairly scrutinized. Also on December 4, 2012, Ms. Naugle emailed Ms. Winn about the plaintiff, stating "if [the plaintiff] is planning to resign the end of the next pay period [it's] fine with me . . . I hope the meeting goes well."

On December 5, 2012, the suspension meeting occurred at which the plaintiff was issued a one-day suspension. After reviewing her suspension, the plaintiff testified that she agreed that errors had been made in her charting.[6] The plaintiff further testified that she "absolutely" agreed with the improvement that was required of her. After her suspension on December 5, 2012, and up until January 14, 2013, a high percentage of the plaintiff's records were reviewed for accuracy.[7]

The plaintiff filed an informal complaint with Ms. Winn alleging

---

[6]The plaintiff contends, however, that such errors were minor and did not warrant the one-day suspension.

[7]The plaintiff does not deny that a high percentage of her records were reviewed during this time, but does challenge that her performance ever resulted in a threat to patient safety.

harassment on December 6, 2012. Ms. Winn emailed the plaintiff on December 7, 2012, and advised her that Brion T. Lieberman would investigate the plaintiff's complaint as a neutral party.

On December 11, 2012, Ms. Naugle emailed her supervisors stating, in part, "Erin [Winn] assures me that this is all going to follow a path to termination without issue[.]" Ms. Naugle testified that "[a] path to termination would be if an employee does not choose to improve, it would go towards termination."

A number of emails from Ms. Naugle to the plaintiff from December 2012 and January 2013 reflect continued performance issue critiques. In fact, Ms. Naugle admitted that she wanted to proceed with the plaintiff's termination as of December 13, 2012 because the plaintiff's performance issues at that time were "not at the level that [she] would have wanted [the plaintiff] to maintain employment at Geisinger".

The plaintiff emailed Mr. Leiberman on December 12, 2012, and forwarded her formal grievance to him on December 13, 2012[8]. A handwritten notation on the email dated December 14, 2012 by Mr. Liberman indicates that Mr. Snyder would set a grievance meeting to address the plaintiff's performance concerns, while Mr. Lieberman would review and address the

---

[8]Under Geisinger's PIP procedure, if an employee files a grievance, the PIP process cannot proceed to the next step until there is an investigation into and resolution of the employee's grievance.

other items in the plaintiff's complaint, including her discrimination claim. After the plaintiff filed her formal grievance, Ms. Naugle emailed her colleagues and supervisor, stating that she had "great concerns about allowing [the plaintiff] to remain at GSACH unsupervised." Ms. Naugle indicated that "if [the plaintiff] was not voicing a harassment complaint, [she] would be pulling her to Danville for closer supervision or going over there." Also on December 13, 2012, Ms. Naugle emailed Ms. Winn and Mr. Snyder inquiring as to when they could proceed with the plaintiff's termination.

On December 14, 2012, Mr. Leiberman met with the plaintiff in her G-SACH office. Because the plaintiff's complaint was a hybrid complaint about performance and alleged discrimination, Mr. Lieberman informed the plaintiff that Mr. Snyder would evaluate the performance challenges and he would investigate the age discrimination and harassment allegations. As part of his investigation, Mr. Leiberman met with Ms. Naugle and inquired of her scrutiny of the plaintiff as compared to others and how charts were reviewed and issues identified.[9] Ms. Naugle indicated that she held the plaintiff accountable for her performance errors and that she continued to perform quality checks of 20-30 randomly selected PSC RN charts for the entire PSC clinic. Mr. Lieberman did not speak with anyone else about the plaintiff's performance

---

[9]While the plaintiff denies that Mr. Lieberman conducted a proper investigation, she does not dispute that he, in fact, met with Ms. Naugle as part of his investigation.

as he was satisfied with Ms. Naugle's explanation of what had occurred with the plaintiff and communicated the same to the plaintiff. Mr. Lieberman confirmed to the plaintiff that no other employees were on PIPs at that time.

On December 19, 2012, Mr. Snyder met with the plaintiff to address the plaintiff's concerns about the validity of the errors identified in the suspension. According to the plaintiff's testimony, Mr. Snyder reviewed some of the matters that Ms. Naugle had listed on the PIP and indicated to the plaintiff that "these may not seem very important, but if Jayco were to come in, these would be zings." After reviewing the plaintiff's suspension document, Mr. Snyder decided to uphold the suspension. On December 27, 2012, Mr. Snyder issued his report on the review of the plaintiff's performance grievance. Of the eighteen numbered challenges by the plaintiff, Mr. Snyder agreed with Ms. Naugle on all but two. Mr. Snyder found Ms. Naugle's concerns verifiable and documented and suggested that the plaintiff's suspension be upheld.[10] The plaintiff's suspension was formally revised on January 8, 2013, with the plaintiff, Ms. Naugle and Mr. Lieberman all signing off on the revised suspension. In her testimony, the plaintiff testified that she

_____

[10]There is some question as to whether Mr. Snyder's review was as per Step II or Step III of the grievance process. The plaintiff was under the belief that the review was under Step II, whereafter she would have been entitled to either peer review or administrative review. Mr. Lieberman testified that the plaintiff's suspension review was under Step III and that he set up the administrative review meeting between the plaintiff and Mr. Snyder.

did not think that the revised suspension was in retaliation for anything.[11]

Mr. Lieberman met with the plaintiff on January 8, 2013 to discuss Mr. Snyder's decision to uphold the suspension. Mr. Lieberman also informed the plaintiff that he did not find evidence to support her age-based claims. The plaintiff was asked for any additional evidence she may have of age discrimination, but provided none claiming that there was nothing new to add and that Mr. Lieberman had not properly investigated what she had already told him.

Mr. Lieberman testified that the plaintiff alleged retaliation only after initiating legal action.[12] Further, the plaintiff admits that there was no overt evidence of age discrimination, but testified that she had a "feeling" that the actions taken against her were because of her age and that she could not do the required work.

On January 9, 2013, Ms. Naugle addressed charting concerns with the plaintiff and offered "if you would like to go over this or any other matter I am happy to discuss with you one on one . . . Do you have anything else I can

---

[11]The plaintiff denies this statement indicating that she was not aware at the time Mr. Snyder upheld her suspension that she had been placed on "the path to termination" and that her claims of discrimination had not been properly investigated. However, her testimony, which occurred well after the time speaks for itself.

[12]The plaintiff denies this only to the extent that she claims she was not aware of the extent of the retaliation at the time.

offer any assistance on?" The plaintiff declined Ms. Naugle's offer, and Ms. Naugle subsequently drafted the plaintiff's termination with which human resources concurred.

On January 14, 2013, Ms. Winn, Ms. Naugle and the plaintiff were present during the plaintiff's termination meeting. The meeting began with discussion about the plaintiff's performance concerns at which point the plaintiff indicated that she wanted to leave the meeting and the meeting was abbreviated due to her desire to leave. The plaintiff testified that she admitted during the meeting that she committed a charting error when she spoke to a patient who was under 18 years of age without her father being present. She further testified that she received a copy of the complaint resolution procedure policy at the meeting with a handwritten note on the top corner with Ms. Winn's telephone number and January 21, 2013, as the grievance deadline.

Dr. Konitzer testified that he thought the plaintiff did a "very good job" and had no complaints or issues with her work. Dr. Konitzer did not agree with Ms. Naugle terminating the plaintiff, but was not the plaintiff's direct supervisor and did not have any authority regarding the decision to terminate her. Moreover, although no one else complained about the plaintiff, such as CRNAs or patients, Ms. Naugle was the only individual responsible for reviewing the plaintiff's work product and ensuring that it complied with Geisinger's policies, procedures and practices.

Ultimately, Geisinger replaced the plaintiff with an individual who was younger than her and had less experience. However, the individual was still over 40 years of age and had experience as an RN for 20 years. Ms. Naugle had previously issued the individual a 2.8 overall score on her performance review, slightly lower than the plaintiff's overall score of 2.97.

In relation to the instant action, the plaintiff was permitted to discover a total of 16 days worth of patient charts over the period of June 2012 through January 2013 in order to evaluate whether her PSC nurse colleagues were making the same alleged errors that the plaintiff was accused of making. According to Ms. Naugle's deposition testimony, there were errors in those charts which were similar to those of the plaintiff. The two nurses who had committed the errors were twenty years younger than the plaintiff, at ages 47 and 42 respectively. However, Ms. Naugle testified at her deposition that she had never reviewed the charts produced in discovery and was unaware of those charting errors before the instant litigation.

In its motion for summary judgment, the defendant argues that the plaintiff has not offered sufficient evidence to prove that Geisinger's actions in terminating her were taken because of her age or her alleged protected activity. With respect to the plaintiff's age discrimination claim, the ADEA prohibits employers from taking adverse employment action against an employee who is at least 40 years old, 29 U.S.C. § 631(a), "because of such

individual's age." 29 U.S.C. § 623(a). A plaintiff alleging that she was subjected to adverse employment action, such as a termination, in violation of the Act must show that her "age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009). It is not enough for the plaintiff to show that her age was a factor that motivated the employer's action, but she instead must point to evidence that could support an inference that her age had a "determinative influence" on the decision. Id. at 176. This burden remains squarely with the plaintiff, who may prove her claims through direct or circumstantial evidence. Id. at 177.

Prior to the Supreme Court's decision in Gross, the Third Circuit had instructed that direct evidence of age discrimination meant "evidence sufficient to allow the jury to find that "the 'decision makers placed substantial negative reliance on [the plaintiff's age] in reaching their decision to fire [her].'" Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002) (quoting Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998)). Gross fundamentally changed this and now it is clear that "'substantial negative reliance' on age is not enough [to prove discrimination in violation of the ADEA]; the evidence must be a sufficient basis for a reasonable jury to conclude that age was the determinative, but-for cause of the employee's termination." Palmer v. Britton Industries, Inc., 662 Fed. App'x 147, 151 (3d Cir. Nov. 7, 2016).

While this is an exacting burden of proof, the plaintiff may also prove

age discrimination through circumstantial evidence, and when she does so the court applies the familiar burden-shifting framework announced in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). The Third Circuit has explained application of McDonnell Douglas in the context of ADEA discrimination claims as follows:

> Under McDonnell Douglas, the plaintiff bears the burden of proof and the initial burden of production, having to demonstrate a prima facie case of discrimination by showing first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. Once the plaintiff satisfies these elements, the burden of production shifts to the employer to identify a legitimate nondiscriminatory reason for the adverse employment action. If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination. At all times, however, the burden of persuasion rests with the plaintiff.

Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009) (citations omitted); see also id. at 691 (holding that this standard does not conflict with Gross).

In order to show pretext, "the employee must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.

1994). In order to "discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." Id. at 765. Moreover, "[t]he fact that an employee disagrees with an employer's evaluation of her does not prove pretext." Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991), overruled in part on other grounds, St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.' [Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)], and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.' Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)." Id.

Because the plaintiff in this case has admittedly presented no direct evidence of age discrimination, the court analyzes her claim under the McDonnell Douglas framework. The defendant apparently concedes that the plaintiff has set forth a prima facie age discrimination case under this standard and proceeds to argue that it had a legitimate non-discriminatory reason for the plaintiff's termination, i.e., her poor performance and failure to improve her

19

patient charting after repeated counseling. The Third Circuit has recognized performance issues as a legitimate, non-discriminatory reason for adverse employment action. See e.g., Wilson v. Mobilex USA, Inc., 406 Fed. App'x 625, 626 (3d Cir. 2011); Wooler v. Citizen Bank, 274 Fed. App'x 177, 180 (3d Cir. 2008); Silver v. Am. Inst. of Certified Pub. Accountants, 212 Fed. App'x 82, 85 (3d Cir. 2006 (per curiam). Having identified a legitimate non-discriminatory reason for terminating the plaintiff, the defendant argues that the plaintiff must prove pretext by either discrediting its proffered reason for her termination or showing that age discrimination was more likely than not the "but for" cause of her termination.

In an attempt to demonstrate pretext, the plaintiff presents a number of arguments. The plaintiff cites to her work history, including her five years as a pre-surgery clinic nurse at SACH prior to the merger and her employment with Geisinger. With respect to this argument, although the plaintiff's work history is certainly extensive, what is relevant for purposes of the instant action is her work performance while employed for Geisinger, not her work history or performance prior thereto.

The plaintiff also cites to the apparent inconsistency of Ms. Naugle's initial six month performance evaluation, wherein her performance was rated above that of her co-workers, and her subsequent scrutiny of the plaintiff's performance. Here, the record demonstrates that it was not until after Ms.

Naugle's initial positive evaluation of the plaintiff that she learned that the plaintiff's patient volume reports were reflecting a higher patient volume than what G-SACH was actually experiencing. This resulted in a closer look at the plaintiff's work and the discovery of numerous charting errors which are documented in the record.

The plaintiff argues that Dr. Konitzer's disagreement with her termination and the fact that there were no staff or patient complaints and no incidents, malpractice, delayed surgeries or incidents of harm or lack of care to patients demonstrates pretext. The record establishes that Ms. Naugle was the plaintiff's supervisor and it was she who was in charge of determining whether the plaintiff charted according to Geisinger's practices, procedures and protocols. As the plaintiff's supervisor, it was Ms. Naugle who had the authority to discipline and/or terminate the plaintiff. As such, whether others agreed or disagreed with the plaintiff's termination is of no moment. Moreover, there is nothing in the record to indicate that Ms. Naugle was under an obligation to wait until an incident occurred with a patient or procedure before disciplining and/or terminating the plaintiff.

The plaintiff argues that, while Ms. Naugle testified that she would only place an employee in the PIP process for similar repeated errors, her PIP documents did not list repetitive errors and, as such, she should have first been verbally warned for each new alleged error that was not previously

committed. Initially, there is nothing in the record which demonstrates a requirement that each type of charting error be given a separate PIP. Moreover, the testimony of record demonstrates that the PIP is not to contain every single error found, but only a summary or sampling of charting errors. Therefore, it would not be necessary for each error to be specifically noted in a PIP prior to disciplining an employee.

The plaintiff further argues that the defendant overly scrutinized her work product to merit its decision to terminate her. As evidence of this, the plaintiff points to the 16 days of charting and documentation by two other nurses produced in discovery. The plaintiff argues that the nurses who committed errors in these charts were also supervised by Ms. Naugle, were 20 years younger than her and that it would be impossible for Ms. Naugle not discover the errors. Initially, the plaintiff admitted during her testimony that anyone on a PIP would be subjected to heightened scrutiny. Moreover, although the two other nurses may have been younger than the plaintiff, they were still in the protected age group as they were both over 40 years of age. As to Ms. Naugle's review of the charts, the only evidence in the record demonstrates that, while the plaintiff was on her PIP, Ms. Naugle also reviewed a random sampling of 20-30 PSC RN charts per month. There is no evidence in the record that either of the nurses referred to by the plaintiff had their charts reviewed by Ms. Naugle in the random sampling during the

22

relevant period of time or that Ms. Naugle was aware of the charting errors prior to her deposition taken in this litigation.

Finally, in an attempt to demonstrate that the defendant's proffered reason for her termination is pretextual, the plaintiff argues that the defendant hired a younger and less experienced person to replace her. The plaintiff argues that her replacement was over 20 years younger than her and had 26 less years of experience as a Registered Nurse and less experience as a pre-surgery clinic nurse. In addition, the plaintiff argues that this person received a lesser performance review than she did despite being employed by Geisinger for an equal amount of time. As to this argument, the record demonstrates that, although the plaintiff's replacement was younger than her, she was still in the protected class of individuals over 40 years of age. In addition, although the plaintiff's replacement had less experience than the plaintiff, she still had over 20 years of experience as a nurse. Finally, the fact that the plaintiff, who was older than her replacement, had previously been given a higher rating in her 6 month evaluation, is actually contraindicative of age discrimination.

In considering the plaintiff's claim of pretext, the record demonstrates that the defendant hired the plaintiff at 66 years of age. The plaintiff was given a positive evaluation, higher than that of younger employees, and a raise at 67 years of age. The record demonstrates that, after the plaintiff's evaluation,

23

Ms. Naugle learned that the patient volumes being reported by the plaintiff were significantly higher than the actual patient volumes at G-SACH. As a result, Ms. Naugle began monitoring the plaintiff's charting. In doing so, repeated charting errors were discovered. In her deposition testimony, the plaintiff admitted to having repeated charting errors. As a result of the repeated charting errors, the plaintiff was subject to Geisinger's progressive disciplinary process. First, the plaintiff received a verbal warning. When her performance did not improve, she received a written warning. Again, when the plaintiff's performance failed to improve, she received a one-day suspension. This suspension was reviewed and upheld by Ms. Naugle's supervisor, Mr. Snyder. When the plaintiff still failed to show satisfactory improvement, she was ultimately terminated. None of the arguments raised by the plaintiff demonstrate that the defendant's proffered reason for her termination, i.e., her poor performance and failure to improve her patient charting, was pretextual and that, instead, age was the reason and the but-for cause for her termination. The plaintiff's subjective belief that her performance was not so deficient as to warrant adverse employment action does not establish pre-text. Billet v. CIGNA Corp., supra. The defendants are therefore entitled to summary judgment as to the plaintiff's age discrimination claim.

With respect to the plaintiff's retaliation claim, the ADEA prohibits employers from discriminating or retaliating against employees for having

made a charge, testifying, assisting, or participating in an investigation, or other proceedings against the employer. 29 U.S.C. § 623(d). To make out a prima facie case of ADEA retaliation, the plaintiff must show that (1) she engaged in ADEA-protected activity; (2) the defendant took an adverse employment action against the plaintiff after the plaintiff engaged in protected activity; and (3) a causal relationship exists between the plaintiff's protected activity and the defendant's adverse employment action. Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 191 (3d Cir. 2015); Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007); Fogleman v. Mercy Hosp., Inc., 283, F.3d 561, 567-68 (3d Cir. 2002).

Here, the court finds that the plaintiff has failed to meet her prima facie case in that she has failed to establish the third element of causation. The plaintiff can establish causation by demonstrating temporal proximity between the protected activity and adverse action. See, e.g., Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir.2000). Causation may also be established by demonstrating an employer's continued pattern of antagonism after the employee's protected activity. See Robinson v. Southeastern Pennsylvania Transp. Auth., Red Arrow Div., 982 F.2d 892 (3d Cir.1993).

With respect to temporal proximity, this may satisfy the causal link element of a prima facie retaliation claim where the timing is 'unusually suggestive of retaliatory motive.'" Shaner v. Synthes, supra (quoting Krouse

25

v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997)). However, "the mere fact that adverse employer action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir.1997). The Third Circuit has found that a temporal proximity of two days is unusually suggestive of causation, but that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive. Blakney v. City of Philadelphia, 559 Fed. App'x 183, 186 (3d Cir. 2014) (citations omitted). The temporal proximity is measured from the date on which the litigant engaged in her first protection action. Id.

In this case, the plaintiff first complained of age discrimination in December 2012. She was terminated in January 2013. Thus, without supplementary evidence of retaliatory motive, which the plaintiff has failed to present, temporal proximity does not establish causation. In fact, the evidence of record indicates that the plaintiff was placed on the PIP in September 2012 and that Ms. Naugle began preparing for the plaintiff's suspension before her complaints of age discrimination. The plaintiff has pointed to no evidence in the record that Ms. Naugle ever questioned her about the filing of the age discrimination complaint and this was never referred to in the plaintiff's procession of discipline.

With respect to establishing causation through a pattern of antagonism,

26

"[t]he Supreme Court has recognized that 'employers need not suspend previously planned' actions upon learning of protected activity. [T]heir proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Gairloch v. Pennsylvania State Univ., 84 F.Supp.3d 407, 419 (M.D.Pa. 2015) (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001)). In fact, "[w]hen negative performance evaluations pre-date any protected activity, courts should not infer a causal link between any subsequent protected activity and an employee's eventual termination." Id. (citing Verma v. Univ. of Pennsylvania, 533 Fed. App'x 115, 119 (3d Cir. 2013).

As indicated, the plaintiff's negative performance evaluations, which began in September 2012, pre-dated her complaints of age discrimination in December 2012. The plaintiff's termination followed her performance issues which she had failed to remedy. The fact that the defendant followed through with its line of discipline for the plaintiff's performance issues and eventually terminated her for failing to remedy those issues does establish the requisite causation.

For the foregoing reasons, the court finds that the plaintiff has failed to establish a prima facie case of retaliation. As such, the defendants are

entitled to summary judgment as to the plaintiff's retaliation claim.[13]

An appropriate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**



**Date: March 26, 2018**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-0961-01.wpd

---

[13]Because the court has found that the defendants are entitled to summary judgment as to both the plaintiff's age discrimination and retaliation claims, the court need not address the defendant's argument that the plaintiff failed to mitigate.